WILLIAMSON and others *v.* FIELD's Executors and Devisees.

When the person to whom a remainder after a life estate is limited, is ascertained, and the event upon which it is to take effect is certain to happen; it is a vested remainder, although by its terms it may be entirely defeated by the death of such person, before the termination of the particular estate.

It is the uncertainty of the *right* of enjoyment, which renders a remainder contingent; not the uncertainty of its actual enjoyment.

The present capacity of taking effect in possession, if the possession were to become vacant, distinguishes a vested from a contingent remainder; not the certainty that the possession ever will become vacant while the remainder continues.

A testatrix devised real estate to three trustees in fee, in trust to receive the rents, issues and profits thereof, and pay the same to her grandson during his natural life; and from and after his death, in further trust to convey the same to his lawful issue living at his death in fee; and if he should not leave any lawful issue at the time of his death, then in further trust to convey the same to another grandson of the testatrix in fee, or to such person in fee as he might by will appoint, if he died prior to the tenant for life: *Held*, that the children of the tenant for life, (all of whom were born after the death of the testatrix,) took vested equitable remainders in fee in the real estate, as they were born respectively; which remainders were liable to be divested as to each on his or her dying during the lifetime of their father, and were subject to open to let in the after born children of the tenant for life.

Under such a devise, no conveyance of the legal title by the trustees is now necessary in order to vest the whole estate in the children at the determination of the particular estate.

In a suit to foreclose the equity of redemption in lands mortgaged and to sell the lands, all persons having an interest in the equity of redemption should be made parties.

This was held of persons having a vested equitable remainder in fee in the equity of redemption, and that their rights were not affected or impaired by a decree of foreclosure and sale in a suit to which they were not parties, although the trustee vested with the legal title was made a defendant.

The fact that the trustee executed the mortgage of the estate under the authority of the court of chancery, and with the sanction and joint execution of a master of the court, as prescribed in the order; was held not to excuse the omission to make the remaindermen parties.

As a general rule, cestuis que trust must be made parties, where the equity of redemption is vested in a trustee for their benefit. But where there are remote trust limitations, it suffices to bring before the court the beneficiaries *in esse*, who have the first estate of inheritance, together with those having the preceden estates and prior interests, and the trustee.

An order upon a purchaser under a decree of foreclosure to complete the sale, made

on a specific objection taken to the title ; does not decide a question of title or of parties, which was not made the ground of objection, or brought to the consideration of the court. And such order is not a protection to the purchaser, against persons having vested interests in the equity of redemption ; who ought to have been, but were not, made parties to the foreclosure.

Chancery will not compel a purchaser in good faith under its decree, to take a defective title, where the defect is brought to its notice ; but it does not undertake that none but good titles shall be sold under its directions.

Under an order of the court of chancery, authorizing a trustee to execute mortgages on lands, in which he has a life estate, and his children an estate in fee, to secure monies already advanced to him and debts owing by him, as also monies to be advanced or lent to him ; and authorizing him, amongst other things, to apply the monies to the payment of his debts, and invest the surplus so as to yield an income for the support of his family ; it was *held*, that he could not execute a mortgage for clothing thereafter to be furnished for himself or his children, nor upon a verbal or written agreement to advance money at a future day.

In general, no statute is to have a retrospect beyond the time of its commencement. And a new statute of limitations, should not be so construed as to cut off or abridge a vested right, unless its language imperatively requires that construction.

The provision of the revised statutes, prescribing a limitation of ten years to suits of exclusive equitable cognizance, does not apply to a right which was vested and perfect before those statutes took effect.

March 11, 12, 13 ; July 21, 1845.

THE bill in this cause was filed on the tenth day of July 1842, by Charles A. Williamson and Catharine H. his wife, Rupert J. Cochran and Isabella M. his wife, and Bayard Clarke ; (the latter, with the two married women, being the only children of Thomas B. Clarke, formerly of the city of New York, deceased, who survived their father;) against Hickson W. Field and John M. Bradhurst, the sole acting executors and trustees of the last will and testament of Moses Field, late of the same city, deceased ; and against his seven infant children who were his devisees and legatees, as well as his heirs at law.

The object of the suit was to have a re-conveyance of the title of the store and lot known as number 257 Broadway in that city, which Moses Field claimed in fee at his death ; and also an account of the rents and profits of the property, during the time it was possessed by him and the trustees under his will. The pleadings and testimony presented also several different and important questions upon the validity and effect of certain statutes authorizing Thomas B. Clarke to sell and mortgage the real

estate to which his children were presumptively entitled after his death, and of the orders of the Court of Chancery founded upon those statutes; which are not discussed in the judgment pronounced by the court.

The facts upon which the decision was made, were the following:

Mrs. Mary Clarke, the widow of Thomas Clarke, at the time of her death in July, 1802, was seised in fee simple of the lot in question, as well as of other real estate to a large amount. By her last will and testament, dated April 6th, 1802, and duly executed, she made the following devise:

"Item, I give and devise unto the said Benjamin Moore and Charity his wife and to Elizabeth Maunsell and their heirs forever, as joint tenants and not as tenants in common, all that certain lot of land number eight in the said thirteenth allotment of the said patent, containing one hundred acres: also all that part of my said farm at Greenwich aforesaid, called Chelsea, lying to the northward of the line hereinbefore directed to be drawn from the Greenwich road to the Hudson River twelve feet to the northward of the fence standing behind the house now occupied by John Hall, bounded southerly by the said line, northerly by the land of Cornelius Ray, easterly by the Greenwich road, and westerly by the Hudson, including that part of my said farm now under lease to Robert Lenox; also all my house and lot with the appurtenances known by number seven within the limits of the prison and now occupied by Thomas Byron; to have and to hold the said hereby devised premises to the said Benjamin Moore and Charity his wife and Elizabeth Maunsell, and to the survivor or survivors of them and the heirs of such survivor, as joint tenants and not as tenants in common, in trust to receive the rents, issues and profits thereof, and to pay the same to the said Thomas B. Clarke, natural son of my late son Clement, during his natural life and from and after the death of the said Thomas B. Clarke, in further trust to convey the same to the lawful issue of the said Thomas B. Clarke living at his death in fee, and if the said Thomas B. Clarke shall not leave any lawful issue at the time of his death, then in the further trust and confidence to convey the said hereby devised premises to my said grandson Clement C.

Moore, and to his heirs or to such person in fee as he may by will appoint in case of his death prior to the death of the said Thomas B. Clarke."

The house and lot described in the will as number seven within the limits of the prison, are the premises on Broadway respecting which the suit was brought; and were known as lot No. 320, on the map of the Church Farm, so called, belonging to the corporation of Trinity Church.

In January, 1805, Thomas B. Clarke obtained from the trustees named in the will, a power of attorney, authorizing him to demise the trust lands for terms not exceeding twenty-one years. On the 30th of September, 1808, he procured two of the trustees, Mr. and Mrs. Moore, to give him another power of like import, and containing authority to sell and assign his own interest in the property, with the right to the rents. On the 30th of July, 1810, T. B. Clarke under one or both of these letters of attorney, leased the Broadway lot in the names of Mr. and Mrs. Moore as trustees, to George Sinclair, for ten years from May 1, 1810, at the annual rent of $450.

The power of demising under the will being too limited, T. B. Clarke filed a bill in the Court of Chancery against the trustees of the will, and Clement C. Moore, together with his six children then living, (all of whom were infants, and all but Catharine and Isabella afterwards died in his lifetime;) for the purpose of obtaining a more enlarged authority in respect of leases. A decree was made in that suit, on the 22d of February, 1813, authorizing the trustees, with the assent of T. B. Clarke, to lease any of the premises devised to them in trust, for a term or terms not exceeding twenty-one years; the whole consideration to be reserved in yearly rents payable to the trustees.

On the 8th of March, 1813, T. B. Clarke as the attorney of the two trustees Mr. and Mrs. Moore, (the third trustee Mrs. Maunsell being still alive,) executed another lease of the Broadway lot to Sinclair, for fourteen years from the first day of May, 1820, at the same rent of $450 yearly. This lease purported to be given under the order of the court. T. B. Clarke thereupon for $950 paid to him by Sinclair, released the rents reserved by the lease.

In January, 1814, he procured the trustees to consent to the

substitution of another trustee in their stead; and he then obtained the passage of an act of the legislature, on the 1st of April, 1814, entitled "An act for the relief of Thomas B. Clarke;" by which, amongst other things, the Court of Chancery was authorized to appoint one or more trustees of the property devised by Mary Clarke as before stated; the Chelsea farm was to be by them divided into two equal parts, one of which they were to retain upon the trusts of the will, and the other was to be laid out into lots for sale; and they were authorized and required to sell the latter half and also the Broadway lot, as soon as they conveniently could. There were various provisions in the act for the investment of the proceeds and the disposal of the income.

Nothing was done under this act, and in 1815, T. B. Clarke again petitioned the legislature, representing that Clement C. Moore had released to him his contingent remainder in the trust property, and that he had been unable to procure any person to undertake the duties of trustee. Mr. Moore's grant and release to T. B. Clarke was duly executed on the 21st day of February, 1815.

Upon this "an act supplemental" to the previous act was passed on the 24th of March, 1815, declaring that Mr. Moore's interest was vested in T. B. Clarke, and dispensing with the substitution of new trustees. The act authorized T. B. Clarke to execute and perform every act and duty in regard to the trust estate, that could be performed by the trustees; but no sale was to be made by him until he should have procured the Chancellor's assent.

T. B. Clarke thereupon presented a petition to the Chancellor, upon which and a master's report, an order of the court was made, dated July 3, 1815, giving the Chancellor's assent to the sale by T. B. Clarke of the east half of the Chelsea farm, and the Broadway lot; the sales to be made under the direction of a master. Out of the proceeds, he was authorized under the master's direction, to pay for debts due and to be contracted, for the necessary purposes of his family.

In 1816, he again applied to the legislature, and obtained the passage of an act on the 29th of March, 1816, entitled as "An act farther supplemental," &c., by which he was authorized to

mortgage the lands previously authorized to be sold, and to apply the money raised by mortgage or sale, to the purposes required or to be required by the Chancellor under the several acts theretofore passed. A petition to the Chancellor ensued, which was referred to a master, and on the petition and master's report, an order was made by the court on the 1st of November, as of the 30th of May, 1816, the directing part of which is in these words:

"And on motion of Mr. Samuel Jones, Jr., of counsel for the petitioner, it is ordered, that the said petitioner, under the act entitled, an act further supplemental to the act entitled, an act for the relief of Thomas B. Clarke, passed March the twenty-ninth, one thousand eight hundred and sixteen, be, and he is hereby authorized, so far as the assent or act of this court is requisite, to mortgage instead of selling the lands and premises he was authorized to sell in and by the aforesaid order of this court, of the date of the third day of July last, or any part or parts thereof, and for that purpose to execute and give to the president and directors of the Manhattan Company, or other mortgagee or mortgagees, a mortgage or mortgages in fee of and upon the said lands and premises, or any part thereof remaining unsold, for securing the sum or sums of money to be advanced or lent to the petitioner or for his use, by the president and directors of the Manhattan Company aforesaid, or other mortgagee or mortgagees, and such debt or debts as may be already owing by him to such lender or lenders, with lawful interest therefor; and it is further ordered, that the monies to be procured and the debts to be extinguished by such mortgage or mortgages, be appropriated and adjusted in the same manner and under the same checks and not otherwise, than is provided for in and by the said before mentioned order of this court, and that the said before mentioned order of this court shall apply to and govern the application of monies to be raised by mortgage equally as if the same had been raised by a sale of all or any of the said lands and premises authorized in and by the said order to be sold; and further, that any party interested or to become interested therein, have liberty to apply to this court at any time or times hereafter, for any further or other orders and directions in or touching the premises."

On the 15th of March, 1817, another order was made by the

court, founded upon a petition of T. B. Clarke and a master's report; by which he was authorized to sell and dispose of the south half, instead of the east half, of the Chelsea property, together with the Broadway lot; and to mortgage all or any part or parts of such southern moiety; also to convey any of the same moiety in payment of his debts then owing; all to be done with the approval of a master. It was also ordered that he might take the monies arising from the premises, and apply the same in payment of his debts, and invest the surplus in such manner as he might deem proper to yield an income for the support of his family.

· These documents were very voluminous, and no more of any of them has been stated, than was deemed indispensable to an understanding of the points decided.

On the 25th of January, 1817, by virtue of executions issued on judgments docketed against T. B. Clarke in 1814 and 1815, the sheriff sold his right, title and interest in and to the lot in question, to John Wallis and Henry Simmons, each being a plaintiff in one of the judgments. At the request of Clarke, they conveyed the lot on the 19th of April, 1817, to James A. Hamilton, for his benefit.

On the 16th of October, 1818, T. B. Clarke, describing himself as one of the devisees of Mrs. Mary Clarke, and Mr. Hamilton as a master in chancery and as trustee for T. B. Clarke, executed a mortgage of the Broadway lot to Jonas Mapes and James Oakley, to secure the payment of $1000 with interest in one year, according to T. B. Clarke's bond of the same date to Mapes and Oakley. The mortgage recited Mrs. Clarke's devise in trust, and that by virtue of divers acts of the legislature and orders of the Court of Chancery, T. B. Clarke, with the assent of a master in chancery, was authorized to mortgage the premises. Mr. Hamilton's approval as master, was indorsed upon the mortgage.

On the next day, a like mortgage in every respect, on the same lot, was executed by T. B. Clarke and Mr. Hamilton to David S. Kennedy, to secure Clarke's bond for $3500, with interest, payable in one year from its date. This mortgage was approved in like manner by Mr. Hamilton as master.

The consideration of the bond and mortgage to Mapes and Oakley, is examined in detail in the opinion of the court. It suffices here to state, that it was for their account against Clarke as his tailors, including some clothing for his children; for money lent to him in small sums; and for clothing, money and their note, furnished to him the fall and winter after the securities were given. The evidence respecting the consideration of the mortgage to Mr. Kennedy was not distinct. It appeared that he received it for a debt, or part of a debt, due to him from a firm styled Bleecker & Lefferts, and that T. B. Clarke had some transactions with that firm which induced him to execute the mortgage. In Mr. Kennedy's answer to the foreclosure bill presently mentioned, he stated that Clarke owed the amount to Bleecker and Lefferts for money lent.

In the latter part of the year 1819, Mapes and Oakley filed their bill in the Court of Chancery to foreclose the mortgage executed to them by T. B. Clarke and Mr. Hamilton. They stated the indebtedness of Clarke to them, (as is fully noticed in the opinion of the court,) and the defendants named in their bill were T. B. Clarke and Messrs. Hamilton and Kennedy. At that time Clarke had children living, viz. the three who are complainants in this suit, and Clement who was his eldest child, and who was then under age, and who died in 1822 or 1823, during the life of his father.

Mr. Kennedy answered the bill, setting up his junior mortgage, and Mr. Hamilton answered claiming the surplus, if any there should be, as the trustee of T. B. Clarke. The latter did not enter his appearance in the suit.

On the 24th of January, 1820, a decree of foreclosure and sale was entered in Mapes and Oakley's suit which recited the report of a master finding the whole amount of the respective mortgages to be due to the complainants and to Mr. Kennedy. It also recited that the cause was heard on the consent of the defendant's solicitors and their waiver of notice of hearing. The decree directed the payment, first of the costs of all the parties, next the debt to Mapes and Oakley, then the debt to Mr. Kennedy, and the residue of the proceeds, if any, to Mr. Hamilton as trustee for the benefit of T. B. Clarke.

The lot in Broadway was sold by a master of the court under this decree, on the 8th day of March, 1820, to Moses Field, for $4050. At that time it was still in the occupation of Sinclair under his lease, who claimed the right to hold it till May 1, 1834, and that the rent was discharged. The master at the sale, announced the existence of the leases, and that the sale would be subject to the same. The lot in fee in possession, was worth about $9000 at the time of the sale.

The counsel of Mr. Field suggested doubts as to the authority of T. B. Clarke to execute a mortgage of the premises, and he declined to complete his purchase. The master conducting the sale, thereupon made a special report to the court dated March 31st, 1820, setting forth the sale and that Mr. Field refused to accept a deed and pay his bid, because he was advised that T. B. Clarke was not authorized to mortgage the lot in Broadway, and therefore the title under the sale would not be good; but whenever the court should decree that he had a right to mortgage the lot, and that a sale under the decree would give a good and valid title to Mr. Field, he was ready and willing to complete his purchase. With this report a written stipulation was laid before the chancellor, signed by the solicitors for Mapes and Oakley and Mr. Field, to the effect that the question as to the validity of the title to the premises should be submitted to the Chancellor, with a question as to interest on the bid. Upon these papers the Chancellor made an order in the suit dated April 4th, 1820, reciting the submission of the question on the master's report by the respective solicitors, and ordering Mr. Field to perfect his purchase and accept a deed of the lot. Mr. Field accordingly paid the amount of his bid, and received a master's deed of the Broadway lot, bearing date March 8th, 1820. This deed recited or referred to the will of Mary Clarke, and the several acts of the legislature and orders founded thereon which have been heretofore mentioned. The proceeds of the sale were applied as directed in the decree.

Soon after he received his deed from the master, Mr. Field commenced an action of ejectment in the Supreme Court against Sinclair, to recover the possession of the lot in question, on the ground that his leases were invalid, and after a long and expensive litigation, in the course of which Sinclair removed the cause

to the court of last resort, Mr. Field finally recovered the premises; and he was put into actual possession on the 19th of April, 1827.    See the ejectment suit reported, *Sinclair* v. *Jackson, ex dem. Field,* (8 Cowen's R. 543,) on its decision in the Court for the Correction of Errors.

Within a year or two after obtaining the possession, Mr. Field removed the old buildings, and erected on the lot a very large and valuable store, at an expense of $12,000 to $15,000, which rented for from $3000 to $3300 annually from 1830, to the hearing of the cause ; at which time the property in fee was estimated to be worth from $35,000 to $40,000.

Mr. Field died in November, 1833, having devised all his real and personal estate to his executors, in trust, to receive the rents, income and profits, and to dispose of the whole as therein expressed.    His seven children were his principal devisees and legatees under the will, and they were all infants when the answers were put in in this cause.    Mr. Field, and his executors after his death, received the rents and profits of the Broadway lot, from the time of his entry, until the hearing of the cause.

T. B. Clarke died intestate on the first day of May, 1826, and his only children who survived him, were the three named as complainants.    All his children who died before him, were intestate and left no issue.

Of his surviving children, Catharine became of age on the 5th of June, 1828, and her marriage with Mr. Williamson took place May 10th, 1827.    Isabella became twenty-one years of age on the 11th of June, 1830, and she was married after that event to Mr. Cochran.    Bayard Clarke attained his majority, on the 17th of March, 1836.

The bill charged that the mortgages to Mapes and Oakley and to Kennedy, were not conformable to the acts of the legislature or to the orders of the court, and were void ; and that Mr. Field by the recitals in his deed had constructive if not actual notice thereof.

That the decree of foreclosure and sale had no force or effect whatever upon the complainant's right and title in the lot in question ; and that Field was cognizant of the wrongful acts of T. B. Clarke in the premises.

The bill prayed for an account of the rents and profits of the lot, and after discharging all just allowances and what if anything was justly chargeable on the two mortgages, for payment of the balance. And for leave to redeem, if the rents proved to be insufficient; and for a surrender and conveyance of the lot to the complainants; and for general relief.

The infant defendants put in a general answer by their guardian *ad litem*. The executors of Mr. Field answered at large. They insisted on the validity of the mortgages and of the regularity of the foreclosure and sale. That Field had no notice of any of the frauds and irregularities and defects charged in the bill. That he was a purchaser in good faith without notice, for a valuable consideration fully paid. That he purchased under a decree of the Court of Chancery, and was compelled to take the title by a special order of the court adjudging it to be a valid title. And that his possession and that of his executors had been adverse to the complainants from its commencement. All these matters were insisted upon as a bar to the suit. The executors also insisted upon the lapse of time as a bar, and also set up the ten years limitation of suits in equity, contained in the revised statutes. Also that there could be no partial redemption, and that all the complainants except Bayard Clarke, were barred by lapse of time and the statute. They denied their liability to account at all for the rents and profits, and insisted that in no event ought they to account for more than six years preceding the commencement of the suit.

The cause was heard on the pleadings, proofs and documentary evidence.

*David Dudley Field,* for the complainants.

*John Jay* and *George Wood,* for the defendants.

Mr. Field, made the following points.

I. The complainants are entitled to come into this court for relief, either as persons interested in the subject of the orders heretofore made in this court, or as the owners of the equity of redemption of the mortgaged premises. (1 Hoff. Ch. Pr. 420; 5

Madd. 28; Mitford's Pl. 93, 92 and notes; 1 Barb. Ch. Pr. 334; 2 ibid. 211.)

II. The mortgages to Mapes and Oakley and to Kennedy were invalid for the following reasons :

1. The acts of the legislature under which they were given were unconstitutional. (*Jones* v. *Perry*, 10 Yerger, 59; *Taylor* v. *Porter*, 4 Hill, 140.)

2. The orders of the Court of Chancery were not in conformity to the acts. (*Cochran* v. *Van Surlay*, 15 Wend. 442, 444 to 446; S. C. 20 Wend. 373, 374, 378; 3 Atk. 712; 2 J. C. R. 246, 400; *Bloom* v. *Burdick*, 1 Hill, 130; *Waldron* v. *Macomb*, ibid. 111.)

3. The mortgages were not in pursuance of the orders. (*Cochran* v. *Van Surlay*, 20 Wend. 387, per Verplanck, Senator.)

III. If the mortgages were not actually null and void, they were so far an abuse of the authority of the court and subversive of the complainants rights, that this court will now review the whole transaction, and will restore the property to the complainants on payment to the defendants of what their ancestor paid with interest. (Verplanck, Senator, in 20 Wend. 386; *Gifford* v. *Hart*, 1 Sch. & Lef. 386; Cruise's Digest, tit. 33, § 49 and 53.)

IV. If the mortgage was valid, the complainants not being parties to the foreclosure, are not foreclosed, and may now redeem, in the common course. (Story's Eq. Pl. 176, 182, 187; Calvert on Parties, 181; *Calverley* v. *Phelp*, 6 Madd. 229; *Wilton* v. *Jones*, 2 Y. & Coll. New Cases, 224; *Helm* v. *Hardy*, 2 B. Monroe's R. 232; *Eagle Ins. Co.* v. *Campbell*, 2 Edw. 127; *Kortright* v. *Smith*, 3 Edw. 402; *Rogers* v. *Rogers*, 3 Paige, 379; *Nodine* v. *Greenfield*, 7 ibid. 544.)

V. The complainants have not lost their rights by time.

1. They are in time at any period within twenty years after Field got possession, which was in 1827.

2. The revised statutes do not apply to this case, their rights having accrued previously.

3. If the revised statutes did apply, twenty years would still be the limitation because the remedies are concurrent at law and in equity.

4. If the remedies were not concurrent, and the limitation were ten years, the bill was in time, because the youngest child became of age in 1836, and the statute did not begin to run till all came of age.

5. Even if it were otherwise, and the statute began to run against each as he became of age, the youngest is in time, and may redeem the whole property.

(Under the fifth general point, the counsel referred to 2 R. S. 301, 302, § 52 ; Blansh. on Lim. 65 to 67 ; *Moore* v. *Cable,* 1 J. C. R. 385 ; *Blake* v. *Foster,* 2 Ball & B. 387 ; *Burke* v. *Lynch,* 2 ibid. 426 ; *Dash* v. *Van Kleeck,* 7 Johns. R. 493 ; *Sackett* v. *Andross,* 5 Hill, 334, per Bronson, J.; *Van Hook* v. *Whitlock,* 3 Paige, 409 ; *Henry* v. *Stone,* 3 Beavan. 355 ; Calv. on Parties, 11, and note 3 ; *Morse* v. *Hovey,* 9 Paige, 167 ; *Brinckerhoff* v. *Lansing,* 4 J. C. R. 65 ; *Western Ins. Co.* v. *Eagle Fire Co.* 1 Paige, 284 ; Mitf. Pl. 179, 180 ; *Davies* v. *Quarterman,* 4 Y. & Coll. 257.)

Mr. Jay, for the defendants, made the following points :

I. The decree in the suit on the mortgage was binding upon the children of Clarke, and barred their rights in the equity of redemption, they being foreclosed thereby.

1. Clarke held the entire legal and equitable estate in fee in himself for his own benefit, in respect to his estate for life and his contingent remainder in fee, and for the benefit of the children to the extent of their contingent possibility in fee.

2. The children had no estate either legal or equitable, vested or contingent, but only a possibility, the whole legal and equitable estate being in Clarke the assignee of the trustees.

3. Clarke as the father and natural guardian, and as special guardian under the statute under the special supervision of the Chancellor, had such a management and direction of the rights of the children as sufficiently to represent them in equity, where parties may be dispensed with if convenient or unnecessary to produce them, and especially in a suit where the special rights and equities of the trustee and minors are not brought in question.

II. The acts of the legislature in question were constitutional

and valid, being designed to apply the contingent rights of the infants to their maintenance and support. (*Cochran* v. *Van Sur-lay*, 20 Wend. 365.)

III. The orders in chancery under which the mortgages were given, were in substantial conformity with the acts. (20 Wend. 375, 378, per Chancellor.)

IV. There being no collusion proved between Field, the purchaser, and the parties to the. foreclosure suit, the court will not inquire collaterally into the merits of that suit, or of the mortgages on which it was founded. (20 Wend. 385, per Verplanck, Senator; 2 Story's Eq. Jurisp. § 1124, 1125; Mitf. Pl. 163; Calv. on Part. 19, 20; *Drew* v. *Hardy*, 5 Price, 319; 4 Kent Comm. 186; Story Eq. Pl. 88; *Dayell* v. *Champness*, 1 Eq. Ca. Abr. 400, pl. 4; 3 Madd. 245; 1 Barb. Ch. Pr. 85; 2 Paige, 304, 305; 20 Wend. 387; 2 Story's Eq. Jur. § 1718; *Doe* v. *Provost*, 4 Johns. R. 65; Dougl. R. 776; 1 Cruise's Dig. 503, tit. 12, ch. 2, § 31; *Stanley* v. *James*, 16 Wend. 238, 239; 1 Preston on Abstr. 75, 76, 77.)

V. If there had been any misapplication of the funds raised by the mortgages, or of such parts of them as sprung out of the contingent rights of the infants and were applicable to their maintenance, the purchaser under the decree is protected against it, and this court, in the absence of fraud and collusion on the part of the purchaser, will not look behind the decree.

VI. If the court could look behind the decree as between other parties, it will not as against Field and those claiming under him, as a purchaser for a valuable consideration without notice.

VII. Two of the children are barred by the statute of limitation prescribed in the revised statutes which is prospective and applies to their case.

VIII. In respect to the other child, the statute runs, except as to his part as tenant in common.

Mr. Wood, referred to the following authorities:

As to the power of the court under the acts of the legislature, (20 Wend. 374, 378.) That the children of T. B. Clarke had only a possibility, during his life, and not a vested interest or right; 1 Preston on Estates, 76; *Lampet's Case*, (10 Coke,

46;) *Pelletreau* v. *Jackson*, (11 Wend. 120 ; and 2 Maule & S·
165, there cited ;) *Moore* v. *Lyons*, (25 Wend. 119.) On the
question of parties in the foreclosure suit, *Nodine* v. *Greenfield*,
(7 Paige, 548 ;) *Yeates* v. *Hamblin*, (2 Atk. 237, 238 ;) Story's
Eq. Pl. § 108, 110, 170, 227 ; 2 Story's Eq. Jur. § 1067 ; *Well-
beloved* v. *Jones*, (1 Sim. & St. 43 ;) and the decree and order to
complete the sale in the foreclosure suit. On the lapse of time
and the statute of limitations, 2 R. S. 301, 302, § 52 ; *Ogden* v.
*Astor*, (MS. case before V. C. McCoun ;) and as to cumulative
disabilities, *Bradstreet* v. *Clark*, (12 Wend. 676 ;) *Jackson* v.
*Johnson*, (5 Cowen, 74 ;) *Demarest* v. *Wynkoop*, (3 J. C. R.
136.)

Mr. Field, in reply, referred to *Watson* v. *Spence*, (20 Wend.
260 ;) Cruise's Digest, title 16, chap. 1, § 35, 36, 41, and Fearne,
there cited ; *Jackson* v. *Waldron*, (13 Wend. 178, 195 ;) *Moore*
v. *Lyons*, (25 ibid. 119 ;) *Doe* v. *Noel*, (1 Maule & S. 327 ;)
Story's Eq. Pl. 193, 197, 207, 209 ; Lewin on Trusts, 610 ; 2
2 Story's Eq. Jur. § 1254 to 1266, 1124 to 1135 ; *Haynes* v.
*Beach*, (3 J. C. R. 459.)

THE ASSISTANT VICE-CHANCELLOR.—There is no doubt but
that the decree of this court upon the foreclosure of the mortgage
of Mapes and Oakley, is final and conclusive upon the complain-
ants, not only as to the validity of that mortgage, but as to their
right to redeem the lands in question, if they were properly re-
presented in the foreclosure suit.

They were all in being before that mortgage was executed, but
neither of them was made a party defendant in the suit ; and
Clement the eldest child of Thomas B. Clarke, who survived till
after the sale under the mortgage, was also omitted in the pro-
ceedings for its foreclosure.

It is contended by the defendants, that it was unnecessary to
make the children of Thomas B. Clarke who were then *in esse*,
parties to the suit upon Mapes and Oakley's mortgage, for two
reasons. *First*, because at that time the children had *no estate
or interest* in the lands, either legal or equitable, vested or con-
tingent. They had a mere *possibility*, to the effect that if they

should survive their father, they might become entitled to the property in common with all his surviving issue.

*Second.* If the children had an interest, they were sufficiently represented in the suit by their father, who was their trustee and clothed with the legal title, and who was in effect their special guardian, under the statutes and the orders of this court providing for the disposition of the property.

On the other hand, the complainants insist that the children of Clarke, as they were respectively born, took vested remainders in fee, and were indispensable parties to any suit which sought to cut off their equity of redemption or affect their rights in the mortgaged premises.

Before entering upon the consideration of these vital questions, I will advert to the defendants claim that they were before the Chancellor and were decided by him in the foreclosure suit and upon the motion to compel Mr. Field to complete his purchase made at the master's sale. The decree itself certainly furnishes no ground for this claim. Clarke suffered the bill to be taken as confessed, and the decree was taken *ex parte* against the other defendants, whose solicitor waived notice of hearing. The court did nothing farther than to direct such a decree to be entered as the bill of complaint called for. No legal point or position was presented for its consideration.

The order directing Mr. Field to complete the sale was made upon the master's report setting forth the sale, and his refusal to complete upon the ground of his being advised by counsel that Clarke was not authorized to mortgage the premises and therefore the title under the decree would not be good. The report also stated Mr. Field's willingness to complete his purchase upon the court's decreeing that Clarke had such authority and that the sale would give a good and valid title. The master's report was submitted to the Chancellor, and the only evidence of his decision, is the order directing Mr. Field to complete the sale.

The question of parties was not brought up by the report, although from the form of the proceeding it is manifest that the report and order were an amicable proceeding. And there is no evidence that this question was presented to the Chancellor, or was thought of by the purchaser or his legal advisers.

The report bears date in New York on the 31st of March, and the order thereon was made at Albany on the 4th of April, 1820. It is quite impossible, under all these circumstances, to assume that the Chancellor decided upon that occasion, the question of parties which is now before the court ; however desirous the court may be to uphold a title purchased under its decrees.

I. My first inquiry therefore is, what was the estate, interest or right, which the children of Thomas B. Clarke had in the property in controversy, at the time of the foreclosure of Mapes and Oakley's mortgage?

Before that period, the legal title had been divested from the trustees named in Mrs. Clarke's will, and for the present I will assume that it was then vested in Thomas B. Clarke and James A. Hamilton ; the latter having an estate for the life of Clarke in trust for him, and Clarke himself having the legal remainder in fee, in trust for his children who should be living at his death, and absolutely for his own benefit if he died leaving no issue living.

In the case of *Cochran* v. *Van Surlay*, (20 Wend. 365,) in the Court for the Correction of Errors, the legality of Clarke's conveyance of certain lands held under the will of Mrs. Clarke and sold under the statutes of the state and the order of the Court of Chancery which form so large a portion of this case, was brought before the former court. In the prevailing opinion delivered by the Chancellor in that case, he says that the children of T. B. Clarke, in existence at the time those orders were made, *had a vested remainder in the estate* after his death, subject to open and let in after born children, and liable to be divested by the death of the children during the lifetime of their father. He also said in effect, that the interest of such after born children was a contingent interest until they came into existence.

In my view of the case of *Cochran* v. *Van Surlay*, this construction of the will made by the Chancellor, was material to the decision in that cause, and is therefore an authority binding upon me. He said distinctly, that if the rights of any after born children had been presented in that suit, the validity of the acts of the leglslature in reference to such rights, would be doubtful. If the rights of the children then in being, were a possibility and

a mere contingency as is now argued, I do not perceive how the legislature could authorize the lands to be sold so as to bind them or those who upon their death before the possibility became reality, should succeed to the estate ; any more than it could authorize the sale as to the possible rights of children of Clarke who might be born after the passage of the acts. And therefore it seems that in order to uphold the legislation in question, the Chancellor and the court of last resort, must necessarily have determined that the children then in being, had vested interests which the legislature could direct to be sold for their support and maintenance. When that case was before the Supreme Court, (*Clarke* v. *Van Surlay*, 15 Wend. 436,) the now Chief Justice said it was conceded on the argument, that the children took a vested remainder in fee in the land, and in his decision he took that to be a correct exposition of the will.

This strengthens the conclusion that the court of last resort sustained the sale made by Clarke which was then in controversy, on the ground that the right of his children in existence at the time of the sale was a vested remainder.

The Chancellor's construction in subsequent cases, accords with his opinion in *Cochran* v. *Van Surlay*.

Thus, in *Nodine* v. *Greenfield*, (9 Paige, 544,) the devise was to the widow for life, and after her death to the children of A. R. who should be living at her death, and the issue of such as should have died ; and in default of such children or issue then living, then over to A. R., and if he were dead, then to the testator's next of kin. The Chancellor decided that the six children of A. R. living at the testator's death, took vested remainders in fee, subject to open and let in after born children of A. R., and subject to be divested by death during the lifetime of the widow. And in effect, he decided that the after born children took vested remainders when they were born respectively.

In *De Peyster* v. *Clendining*, (8 Paige, 295,) the testator vested the property in trustees, and after giving a life interest to his wife, and similar interests subject thereto to his respective children, directed the capital of the respective shares, upon the death of the children, to go to their issue ; and if either of the children died without issue, their shares should go to the survi-

vors. In his opinion, the Chancellor says, " the children of Mrs. H. and of James C. (who were two of the trustee's children,) who are now in existence have *vested remainders* in the capital of the shares of their parents, subject to open and let in after born children; and subject also to be wholly divested by an entire failure of issue at the death of their parents respectively."

In *Moore* v. *Lyons*, (25 Wend. 119, 144;) the devise was to Mary for life, and from and after her death to her three daughters, or to the survivors or survivor of them, their or her heirs and assigns forever. The Chancellor in commenting upon it, remarks, that where a remainder is so limited as to take effect in possession, if ever, immediately on the determination of a particular estate, which is to determine by an event which must unavoidably happen by the efflux of time, *the remainder vests in interest as soon as the remainderman is in esse* and ascertained; provided nothing but his own death before the determination of the particular estate, will prevent such remainder from vesting in possession : yet if the estate is limited over to another, in the event of such death before the particular estate determines, his vested estate is subject to be divested by that event, and the interest of the substituted remainderman, which was before either an executory devise or a contingent remainder, will if he is *in esse* and ascertained, be immediately changed into a vested remainder.

This language, although not absolutely necessary to the decision of *Moore* v. *Lyons*, describes precisely the estate of Clarke's children at the period of the foreclosure of Mapes and Oakley's mortgage. Bayard Clarke, for instance, then had a remainder, which would take effect in possession if ever, at his father's death, an event certain to occur by the efflux of time ; and nothing but his own death before his father's, would prevent his remainder from vesting in possession. Yet that contingency would divest his estate or interest, and it would then vest in his surviving brothers and sisters.

The authority of the Chancellor as thus exhibited in the cases which I have cited, must control in this branch of the court, unless the court of last resort has decided differently. That court, it is said has so decided in the cases growing out of the will of

Medcef Eden. (*Jackson* v. *Waldron*, 13 Wend. 178, affirming the Supreme Court in *Pelletreau* v. *Jackson*, 11 ibid. 110.)

The decision in *Jackson* v. *Waldron*, even if the Eden will were synonymous in its terms with that of Mrs. Clarke, is met by that of the same court in *Cochran* v. *Van Surlay*, if I am right in my observations upon the latter.

But the devise in the two wills is very different. Eden's will vested a qualified or determinable fee in the first taker, (*Waldron* v. *Gianini*, 6 Hill, 601,) and the gift over, was an executory devise. Mrs. Clarke's will gave a life estate to the first taker, with a direct remainder in fee to his children living at his death. The latter as they came *in esse*, became invested with a qualified fee in remainder, like that given in possession to the two sons of Eden. It would not come into their possession till Clarke's death, and was defeasible by their own prior deaths respectively. On the latter event, the executory devise in Mrs. Clarke's will, arose in favor of the substituted remaindermen.

With this brief remark, to point out in part, the difference between the two devisees, I will next attempt to show that the Chancellor's construction of the devise to the children of Clarke is the true one; and that if I err in supposing his opinion ought to control my decision, yet the law and his opinion correspond.

The circumstance that the legal title is given to trustees, makes no difference in the construction, and need not be again mentioned on this point.

A vested remainder, is one by which a present interest passes to the party, though to be enjoyed in future, and by which the estate is fixed to remain to a determinate person after the particular estate is spent. He has an immediate fixed right of future enjoyment.

A remainder is contingent, when it is limited to take effect on an event which may never happen, or which may not happen till after the preceding particular estate ends, or is limited to a person not in being or not ascertained. Now in this case, the event was certain, for T. B. Clarke was certain to die. The person was determinate, as soon as a child was born to him. (See *Doe* v. *Perry*, 3 T. R. 484.) The interest in remainder was doubtless contingent as to the children, before it was known that Clarke

would have issue. The unborn children had a right by way of springing use, and it was until their birth, a possibility only. But whenever a child is born to whom a remainder has been previously limited, such remainder then vests in the child, if he be certain to take it by the terms of the gift. Each child of Clarke was certain to take, unless his estate should be afterwards divested by his death in Clarke's lifetime. In respect of that liability to have the estate defeated, this remainder after the birth of a child, in no respect differs from the instances so common in the English conveyances and devises, of an estate given to A. for life; remainder to B. for life, remainder to C. for life, and then to D. in fee. It has never been doubted but that such remainders to B. and C. are vested.

Yet it is obvious, that the death of either B. or C. in the lifetime of A., will prevent the limitation in his favor from ever taking effect in possession.

It is the present capacity of taking effect in possession, if the possession were to become vacant, not the certainty that it ever will become vacant while the remainder continues, which distinguishes a vested from a contingent remainder. In other words, in the former *the enjoyment* is uncertain, in the latter *the right* to that enjoyment.

Thus in this case, in 1820 there was no certainty that Bayard Clarke would survive his father, and his remainder might therefore cease before the possession became vacant. This was no test of its character. But at that very time, if the possession had become vacant by the death of T. B. Clarke, Bayard C.'s remainder had a present capacity to take immediate effect.

Wherever the preceding estate is limited so as to determine on an event which must certainly happen, and the remainder is so limited to a person *in esse* and ascertained, that the preceding estate may by any means, determine before the expiration of the estate limited in remainder; such remainder is vested. And it is only where the event which is to be the termination of the preceding estate is such as may never happen, or the remainderman is not *in esse*, or not ascertained, or by its limitation some dubious event, other than the determination of the preceding estate,

is required to give it a capacity to take effect; that the remainder is contingent. (2 Cruise, 271.)

It is not material to the remainder's *vesting*, that Clarke's children might not survive him. To prevent its vesting, the event must be one which will not certainly happen before the termination of the particular estate, and yet must arise before the remainder takes effect. There is no such event in this limitation.

Mr. Preston says, when a remainder is limited to a person *in esse*, and ascertained, to take effect by words of express limitation on the determination of the preceding particular estate, this remainder is most clearly and unquestionably vested.

A gift by remainder to a person, with superadded words of contingency, and with a limitation over on that contingency, will be vested and not contingent.

I derive these propositions from 2 Cruise's Dig. 260, 270, 271, Title, Remainder, chap. 1 ; and 1 Preston on Estates, 64, 67, 70, 73, 74.

It is scarcely possible to reconcile all the decisions that have been made on this subtle and perplexing subject.

But the current of authority in favor of holding the remainder in question to have been vested in the issue of T. B. Clarke as they respectively came *in esse*, is clear, strong and uniform. I will cite a few of the cases bearing upon the point.

In *Boraston's Case*, (3 Rep. 19,) the devise was to two persons for eight years, remainder to the executors until such time as Hugh B. should accomplish his full age of twenty-one years, and when he should come to his age of twenty-one years, then the testator willed that Hugh should enjoy it to him and his heirs forever. Hugh B. died under twenty-one ; and it was contended that the remainder to him was contingent on that event. But it was adjudged to be a vested remainder, to take effect in possession at the time when he would be twenty-one.

In *Parkhurst* v. *Smith, Lessee of Dormer*, Willes Rep. 327 ; (S. C. 4 Bro. P. C. 405 ; 3 Atk. 135 ;) the limitation was to A. for ninety-nine years, if he so long lived, and after his death or the sooner determination of that estate, then to trustees during A.'s

life to preserve contingent remainders, and then to A.'s first son in tail male. The question was upon the legal estate in the trustees, and it was insisted that the remainder to them if not void for repugnancy, was at least contingent, because it could not arise upon any event other than A.'s surrender or forfeiture, neither of which was certain to happen. It was held by the King's Bench, and by the House of Lords on a writ of error, that the trustees took a vested legal remainder in the estate.

Lord Chief Justice Willes in delivering the unanimous opinion of the Judges in the House of Lords, declared that there were but two sorts of contingent remainders which do not vest; 1st. Where the person to whom the remainder is limited is not *in esse* at the time of the limitation. 2. Where the commencement of the remainder depends upon some matter collateral to the determination of the particular estate.

I may observe that the first sort mentioned by the Chief Justice, are no longer contingent after the remaindermen come *in esse*, and are ascertained. The remainder to T. B. Clarke's children therefore falls within neither class of contingent remainders as thus defined. The persons were ascertained, and it was to commence in possession on the determination of the particular estate, and upon no other matter or event.

Our Supreme Court, in *Doe* v. *Provoost*, (4 Johns. 61,) held that a devise to a daughter for life, and immediately after her death, to such children as she should have lawfully begotten *at the time of her death*, conferred a vested remainder in fee on the children who were living at the testator's death, subject to open for the benefit of children of the daughter who should be born subsequently.

Our courts thus followed the law as settled in England previous to the revolution.

*Bromfield* v. *Crowder*, (1 Bos. & P. New Rep. 313,) is a leading case in England, on this subject, after the decisions there ceased to be controlling. It was twice argued, and on each occasion most ably, and by counsel of the highest eminence. It came from the Rolls for the opinion of the Common Pleas. The testator devised his real estate to his wife for life, and then to J. Rose

for life in case he survived her, and at the decease of both or the longest liver of them, he gave all his estate to his godson John D. Bromfield, *if John should live to attain the age of twenty-one years*, but in case he died before he attained that age, and his brother Charles B. should survive him, then he gave the estate to Charles if he lived to attain twenty-one and not otherwise; and in case both died under twenty-one, then he gave the estate to John Vale in fee.

The widow and J. Rose died while John D. B. was under the age of twenty-one years, who thereupon claimed the estates. The heir at law on the other hand insisted that the remainders to John and those subsequent, were contingent, and because of the determination of the particular estates before the contingency happened, the remainders could never take effect.

The court certified unanimously that John D. Bromfield took a vested estate in fee simple, determinable upon the contingency of his dying under the age of twenty-one years.

The Master of the Rolls thereupon decreed accordingly, and his decree was affirmed by the Chancellor, and on appeal to the House of Lords, the question was argued there and the decision sustained. See this stated in 5 Dow's P. C. 207, 215, and in 14 East, 603, where it is erroneously mentioned as having gone to the House of Lords on a writ of error.

In *Doe, ex dem. Hunt,* v. *Moore,* (14 East, 601,) the devise was to John M. "*when he attains the age of twenty-one years,*" but in case he should die before he attained that age, then to his brother James when he attained the age of twenty-one, with a like limitation over. John M. was under twenty-one when the testator died. It was decided that he took an immediate vested estate, which was liable to be divested upon his dying under twenty-one years of age.

In the next case which I shall cite, the limitation to the children was in favor of such as should live to be twenty-one. The contingency was therefore precisely similar in its uncertainty to that in Mary Clarke's will, and in both instances the children were all born after the death of the testatrix.

Sarah Trymmer, being seised in fee, devised her lands to John

Roake (her nephew and heir,) for life. The devise over was as follows : "And on the decease of my said nephew, John Roake, I devise all my said estates to and among his children lawfully begotten, equally, at the age of twenty-one, and their heirs as tenants in common, but if only one child shall live to attain such age, to him or her, and his or her heirs, at his or her age of twenty-one. And in case my said nephew John Roake shall die without lawful issue, or such lawful issue shall die before twenty-one, then I devise all the said estates to and among my nephews and nieces, Miles, Thomas, John, James, and Sarah Pinfold, and Susannah Longman, or such of them as shall be then living, and their heirs and assigns for ever."

At the death of the testatrix, John Roake was a widower, without issue. He afterwards married and had four children, who were lessors of the plaintiff. After the birth of two of the children, he levied a fine of the lands in his own favor, in fee. The defendant held under the fine. The four children survived John Roake and two of them had attained the age of twenty-one years, and two had not, when the suit was commenced. The question was, whether the children took vested interests before they became of full age.

The case came before the King's Bench in 1813, in *Doe, ex dem. Roake*, v. *Nowell*, (1 M. & S. 327,) and was elaborately argued by Mr. Preston, against the children of John Roake. The court held that the children took vested remainders. In 1817, a case upon the same devise was removed to the House of Lords, and after a very full argument by distinguished counsel, the decision of the King's Bench was affirmed. (*Randall* v. *Doe, ex dem. Roake*, 5 Dow's P. C. 202.)

*Machin* v. *Reynolds*, (3 Brod. & B. 121,) was a case sent by the Vice-Chancellor for the opinion of the Common Pleas. The testator devised his real estate to his sister and his nephew for their joint lives, and to the survivor for life if the one deceased left no issue ; and one-half to the survivor for life, if the one deceased left issue, the income of the other half to be paid to such issue during their minority. And when and as the children of the sister and nephew respectively, (if any there were,) should attain their age of twenty-one years, then the whole was

given equally to and among all such children in fee. And in case the sister and nephew should both happen to die without leaving issue, or there being such they should happen to die under the age of twenty-one years and without issue, then the estate was given to one Moseley in fee. At the death of the testator, the nephew had a daughter, who then was and still remained his only child. The sister was never married. Both sister and nephew were living at the time of the decision.

The court held that the nephew's daughter, upon the death of the testator, took an estate in fee, in remainder during the lives of the *cestui que vies*, subject to be divested in part, by the birth of other children of the nephew and sister or of either of them, and determinable altogether in the event of her dying in the lifetime of the nephew, or under the age of twenty-one, without leaving issue.

In *Farmer* v. *Francis*, (9 Moore, 310; S. C. 2 Bing. 151,) on a case sent by the Vice-Chancellor, the testator gave all his residuary estate in trust, for the use of his wife during her life, and from and after her decease for the use of his daughter Mary Frances for her life, and from and after the death of both the wife and daughter, or the survivor of them, (still in trust) to and among all and every the child or children of Mary Frances as should be living at the death of such survivor, equally, if more than one, to be divided share and share alike, when and as they should respectively attain the 'age of twenty-four years, and to their respective heirs, &c. forever, to take as tenants in common; and if only one, then the whole to such child upon attaining that age. But in case of no issue of Mary F. living at the death of such survivor, or being such they should all die without issue under twenty-four, then upon trust for two grandsons of the testator.

The testator died in 1814, the widow in 1818, and Mary Frances in November, 1821. At her death she left seven children, the youngest of whom was born in 1817. The court decided (in 1824,) that the seven children took equitable estates in fee as tenants in common.

In that case, besides the qualification that they should be living at the death of the second tenant for life, there was the fur-

ther limitation that they should attain the age of twenty-four years.. Yet it was held a vested estate in the children living at the testator's death, and which opened and let in the after born children, (the latter on their birth taking a vested interest,) and that too without reference to their being under the age of twenty-four years.

The case called for no opinion as to the determination of their estate upon their dying under twenty-four without issue.

The case of *Warter* v. *Hutchinson*, was sent by the Vice-Chancellor to the Common Pleas; and afterwards to the King's Bench in 1823. (2 Br. & B. 349; S. C. 5 Moore, 143; 1 B. & C. 721; S. C. 3 D. & R. 58.) It arose upon a devise to trustees of a complex character, but in effect it was for J. W. for life when he arrived at twenty-one, with remainder in tail to his children, but if he died under twenty-one, then for H. W. for life, when he attained twenty-one, with remainder in tail to his children. J. W. survived the testator, but died under twenty-one leaving a daughter. H. W. became twenty-one. The decision in both courts was that J. W. at the death of the testator took a vested estate for life, and on his own death, his daughter took an estate in tail; and that H. W. at the testator's death took a vested estate for life in remainder expectant on the death of J. W. and failure of his issue.

In *Doe, d. Bills*, v. *Hopkins*, (5 Queen's Bench R. 224, and 8 Lond. Jurist R. 142, Mich. T. 1843,) the testatrix devised real estates to her grandsons, T. and W., in equal moieties during their lives, and after their decease she gave T.'s moiety "to such child or children as he should happen to leave lawful issue at time of his decease, and to their, her or his heirs and assigns for ever, to take in equal shares if more than one." She gave W.'s moiety in like manner to his children. She then, if either T. or, W., or both, should die without lawful issue, substituted J. another grandson, in all respects for the moiety of the one or both so dying, and with similar limitations to J. and his children. And if all three died without lawful issue, or if leaving issue such issue should die under twenty-one without issue, then the estate was to go to the sisters of the testatrix in fee. T. and W.

survived the testatrix who died in 1816. At her death T. had a daughter who died in 1821. In 1818, E. another daughter of T. was born, who was a lessor of the plaintiff. In 1827, T. and W. suffered a common recovery with double voucher, and in 1828 T. died.

It was held that the remainder to the children of T. vested in them, and on the birth of E. she took a vested estate which was liable only to open and let in after born children of T., and which was not barred by the recovery.

The cases of *Duffield* v. *Duffield*, (3 Bligh's R., N. S. 260,) and *Phipps* v. *Acker*, (3 Clark & Fin. 665, 702,) in the House of Lords, are sometimes referred to as conflicting with the previous authorities; but as I think without good reason.

In the former, one of the devises was to the son of A. *who should first attain the age of twenty-one years, and should on attaining that age, take the testator's name.* It was therefore in every sense contingent. There was no person *in esse* who certainly answered the description; and if any one were described, he might refuse to change his name.

It is true that some of the reasoning of the judge who delivered the advisory opinion to the house, is adverse to the decision in *Bromfield* v. *Crowder*, and *Randoll* v. *Doe;* and he relies upon the nice distinctions upon the use of the adverbs of time, "*when*" and "*if*," and "*at*," which though introduced from the civil law courts into the law of legacies, do not apply to real estate, as is shown by the case of *Bromfield* v. *Crowder*, and cotemporary decisions.

The same observation may be made respecting the judgment of the Court of Exchequer in *Festing* v. *Allen*, (12 Meeson & Welsby, 279,) which was decided at the same term with *Doe, d. Bills*, v. *Hopkins*, and is not entirely harmonious with the decisions from *Boraston's Case* downwards.

The other case said to be conflicting, is *Phipps* v. *Acker*, and *Acker* v. *Phipps.* There the devise, was to trustees, in trust to convey the testator's lands in W. to G. H. A. when and so soon as he should attain twenty-one, but in case of his dying under that age and without issue, then over to a residuary devisee; and in trust to convey the residue of the testator's lands to J. C

A. when he should attain the age of twenty-four, upon his giving security for certain legacies, &c., but in case J. C. A. died before he became twenty-four, without issue then over. G. H. A. and J. C. A. were both infants at the testator's death. The Vice-Chancellor, (*Phipps* v. *Williams*, 5 Simons, 44,) decided that G. H. A. took a vested estate, but that J. C. A.'s interest was contingent on account of the condition attached that he should give securities, &c., on attaining the prescribed age.

In the House of Lords, the opinion of the court was delivered by Lord Brougham; and although he finds fault with the decision of Lord Ellenborough in *Doe* v. *Moore*, and criticises some of the kindred cases, yet he concluded that J. C. A. took a vested interest in the interim rents, &c.; and the House reversed that part of the Vice-Chancellor's decree. In regard to the interest of G. H. A., the appeal was never decided.

These recent cases do not impair the great strength of the authorities to which I have referred in support of the position that the children took a vested remainder under the will of Mrs. Clarke. Indeed, the latest case in the House of Lords, *Acker* v. *Phipps*, as well as that of *Doe* v. *Hopkins*, which is the last reported in the Queen's Bench, fully sustains those authorities.

I refer also to the following as agreeing in substance, with those which I have stated. *Doe* v. *Martin*, (4 T. R. 39;) *Stanley* v. *Stanley*, (16 Ves. 491;) *Osbrey* v. *Bury*, (1 Ball & B. 53;) *Driver, d. Frank*, v. *Driver*, (6 Price, 41,) in the Exchequer Chamber; *Carver* v. *Jackson, ex dem. Astor*, (4 Peters, 1, 90;) and 1 Rev. Stat. 723, § 13, where the distinction adopted between vested and contingent future estates, brings the remainder in question within the class of vested estates.

Some of these cases cannot be distinguished from the one under consideration, and the elder decisions are authority; while the later ones are adjudications entitled to the highest respect, as showing what was the common law on this subject.

They are in accordance with the maxim of the law that these limitations shall be construed as vested interests, whenever they can be so taken without doing violence to the expressed intention of the grantor or testator.

And the result of the decisions appears to be, that where the

Vol. II. 71

limitation is to take effect on an event certain to occur, and the person to whom it is limited is ascertained, it shall be deemed a vested remainder; and any provision or contingency which may prevent its ever coming into possession, or may entirely cut it off, is considered a condition subsequent.

The direction that the trustees are *to convey* the property to the issue of Clarke living at his death, in no manner affects the point. The issue would be deemed in equity as having the whole interest after the death of Clarke, without any regard to a conveyance of the legal title. And the objects of the trust having been accomplished, the estate would now be held a legal estate in those entitled under the will. (1 R. S. 727, § 47, 48; ibid. 730, § 61. *In the Matter of De Kay*, 4 Paige, 403. And see *Eckford* v. *De Kay*, 8 Paige, 89, 94, and 26 Wend. 29 on appeal.)(*a*)

My conclusion is that the children of T. B. Clarke, who were living at the commencement of Mapes and Oakley's foreclosure, had at that time, a vested equitable remainder in fee simple in the lands mortgaged. It was to take effect on the death of their father, was liable to be divested as to either child by his or her death before that event, and was subject to open to let in after born children of Clarke.

II. Were the children of Clarke then in being, necessary parties to the foreclosure of the mortgage; and were their rights barred or affected by the decree in favor of Mapes and Oakley?

The general doctrine is that all persons whose interests are to be concluded or affected by the decree, ought to be made parties.

This applies to mortgage cases; and all persons having an interest in the equity of redemption, should be made parties to a bill of foreclosure, and *a fortiori* to a bill for a sale of the property mortgaged. (Story's Eq. Pl. § 193. 4 Kent's Comm. 185, 186, 2d ed.)

Chancellor Kent says, that the general rule includes the heir or devisee, the tenants for life, and the remainderman. He adds,

---

(*a*) And see also *Bellinger* v. *Shafer*, ante, p. 293.

"The question of parties is usually more or less fluctuating and open for discussion. It is governed, in some degree, by circum stances; whereas, the principle that those persons who are interested in the subject, and are not made parties to the suit, are not bound by the decree, is more steady in its operation, for it is founded on natural right."

The defendants contend however that this case is an exception to the general rule. That the circumstance that the trustee was a party, and represented the legal estate as well as the ultimate remainder, was sufficient to bring the rights of the children before the court, and enable it to dispose of the whole subject intelligibly. And this was especially the case, it is said, because the infants were *quasi* wards of court by reason of the acts of the legislature and the orders of the court thereupon; and the master in chancery, who under those orders was bound to protect their interests, was also a party to the foreclosure.

It is conceded to be the general rule, that if the equity of redemption is vested in a trustee in trust, the *cestuis que trust* must be made parties to the foreclosure. All the books agree in this· (Story's Eq. Pl. § 193, 197, 207. Calvert on Parties, 181, 182. *Gore* v. *Stackpoole*, 1 Dow's P. C. 18, 31, per Lord Eldon.)

The only established exception, is in cases of remote limitations of the equity of redemption; in which, on account of the impossibility of bringing in parties not *in esse* or not ascertained, but who ultimately may become entitled, it is held sufficient to bring before the court the persons *in esse* who have the first estate of inheritance, together with the persons having all the precedent estates and prior interests.

In this case no person was made a party who had a vested estate of inheritance, or who had the first estate of inheritance in the mortgaged premises. I speak now of the substance, not forgetting that the trustee had the naked legal title.

The case of *Nodine* v. *Greenfield*, before cited, (7 Paige, 544,) shows the rule where there are successive estates in the equity of redemption; but in that case there was no trust. *The Eagle Fire Insurance Company* v. *Cammet*, (2 Edw. Ch. R. 127,) was a similar case.

In *Calverley* v. *Phelp*, (6 Madd. 229,) the general rule was en-

forced in a case falling far short of this in the necessity of its·application. The equity of redemption had been conveyed to trustees to sell and divide the surplus among persons specified, and the receipt of the trustees was to discharge the purchasers. It was held that the *cestuis que trust* were necessary parties to a bill brought to foreclose the mortgage. (And see *Holland* v. *Baker*, 3 Hare's Ch. R. 68; *Barkley* v. *Lord Reay*, 2 ibid. 306; *Wilton* v. *Jones*, 2 Y. & C. Chy. Cases, 244.)(a)

In *Yates* v. *Hambly*, 2 Atk. 238, (cited by the defendants,) on a bill to redeem, which presents an analogous case, Lord Hardwicke required the first tenant in tail at least to be brought in; and his language shows he would have required it if the conveyance had been in trust with a plain limitation.

In short, the general rule required that these children of T. B. Clarke should be made parties. No authority has been found which dispenses with the necessity of bringing the beneficiaries before the court under such circumstances. Common sense and common right required it. And in no conceivable case, could it be more important to the ends of justice, than in the one before me, where those intrusted with the care of this property, had exhibited so much looseness, if not recklessness, in regard to the interests of the owners of the inheritance.

The cases and treatises cited in support of the omission of the children, do not come up to the point.

The doctrine of representation stated in Mr. Calvert's Treatise, (p. 19, 20.) has no application; as may be seen by referring to what he says of trustees and *cestuis que trust*. (Calvert, 207, &c.)

Nor are the extreme cases any guide, in which from the multitude of parties in interest, the courts have hesitatingly and in a

---

(a) In *Anderson* v. *Stather*, June 27, 1845, before Sir Knight Bruce, V. C., where the mortgagor conveyed the equity of redemption to trustees, in settlement for his daughter on her marriage, out of which she was to receive an annuity, and the trustees were to raise out of the same a sum of money for the children of the marriage; it was held that the daughter and her children were necessary parties to a suit for the foreclosure of the mortgage. (9 Lond. Jur. Rep. 806; 14 Law Journal, N. S., Chancery, 377; 2 Eq. Rep. 245.)

few instances, suffered some of the parties, *having the same degree or extent of interest*, to prosecute or defend for the whole.

Suits for administration, form a distinct class, in which legatees, creditors, &c., come in after decree, and participate in its fruits. *Drew* v. *Harman*, (5 Price, 319,) was suffered to go off on that principle, although a questionable application of it.

It is true that in our practice, we permit a party who assails a deed of trust on the ground of fraud, to proceed against the trustee alone; yet it is not permitted where the complainant is endeavoring to enforce a claim adverse to the interests of the *cestuis que trust*, but which is founded upon the assumed validity of the deed. (*Rogers* v. *Rogers*, 3 Paige, 379.)

I do not perceive that the complainants rights could be any more affected by a decree of the Court of Chancery to which they were not parties, because the court had previously interfered with their property in obedience to the special acts of the legislature; or because a master of the court, who acted in that behalf under the orders stated in the pleadings, happened to be vested with T. B. Clarke's life estate, and was for that cause made a defendant in the foreclosure suit.

Nor does it aid the defendant's case, that T. B. Clarke was the natural guardian of these children, or that he was in effect their special guardian for the management of the estate. Their case is presented in all its strength, by the fact that he was their trustee and vested with the whole legal title; and this as I have shown, does not suffice.

It is said also that Mr. Field was a purchaser in good faith under the decree, without notice, and the court having compelled him to take the purchase, ought to protect him.

Assuming that he was such a purchaser, it does not affect the question. A decree had been made, which was a nullity as to the complainants. The court, knowing nothing of this, and Mr. Field's counsel having failed to discover it and present it to the consideration of the court, made an order to complete the sale. Such order was indeed a matter of course upon the case presented by the master's report, under the Chancellor's view of the authority of T. B. Clarke. If the court guaranteed the titles made under its sales, or undertook to the public that none but good

titles should be sold under its decrees, the argument would have force. But the court holds out no such inducements to purchasers. At most, it will refrain from compelling a bidder to take a defective ti le, on his pointing out the defect or impediment.

It becomes my duty to hold that the rights of the complainants were not foreclosed or affected by the decree in favor of Mapes and Oakley.

III. The validity of the mortgage is the next point in the cause.

The complainants insist that it is invalid and entirely void because, 1. the acts of the legislature on which it was based were unconstitutional, 2. the orders of the Court of Chancery were not in conformity with the acts, and 3. the mortgage was not in pursuance of the orders of the court.

The first of these objections has been overruled in our court of last resort, and my conclusion upon the others relieves me in a great measure from the painful responsibility of examining them at large.

When Mr. Field refused to complete his purchase, Chancellor Kent decided distinctly, that T. B. Clarke was authorized to mortgage the premises in question, *for the debt and under the circumstances* set forth in Mapes and Oakley's bill. Although this decision is not conclusive upon the complainants, it is binding upon me as the judgment of the then head of the court, and no less as the judicial opinion of one of the purest and ablest chancellors that ever administered the principles of equity.

The bill of Mapes and Oakley states that they were merchant tailors, and that T. B. Clarke became indebted to them in $1000 for wearing apparel furnished by them to and for Clarke and his children from the 15th of January, 1815, to October 16th, 1818, which is the date of the mortgage; and that the mortgage was given to secure its payment.

So far as the facts proved in this suit sustain that statement, 1 must hold the mortgage to be valid under Chancellor Kent's decision, without any examination of the soundness of his conclusion. As to the other consideration proved, it will depend upon its own merits, unless it be within the principle of that decision.

At the date of the mortgage, as I construe the testimony, Clarke owed to Oakley, on an account commencing January 20, 1815, $171; and $150 25, besides interest, on a note given January 10, 1815, for a previous account, running from May, 1813. And he then owed to Mapes and Oakley a balance of book account of $273 77. All these accounts were for wearing apparel for Clarke and his children, although but a small proportion was for the latter. As to the orders for clothing drawn by him in favor of third persons, I will not after this lapse of time, say that they were not given for necessaries obtained for himself and his family. Nor can I perceive any reason why Chancellor Kent's principle does not cover the debt incurred in 1813 and 1814, as well as that in the subsequent years.

These items amount to $595 02, and with the interest on the note after six months, make an aggregate of about $630 for which the mortgage is to be deemed clearly valid.

For the remaining consideration, Mapes and Oakley gave to Clarke on the 19th May, 1819, their note for $158, and in the meantime they had furnished to him clothing amounting to $158 50. There was moreover an account against Clarke, contemporary with the prior tailor's bills, for cash lent to him in trifling sums; and this account doubtless made up the balance of the $1000.

I will consider Chancellor Kent's decision as extending to the cash thus advanced. But it does not cover the note or the clothing delivered after the mortgage was executed.

As to the latter, it is plain that the orders of the court did not confer upon Clarke an authority to mortgage his children's lands for clothing *thereafter to be furnished* either to him or them.

Then as to the note, (and in considering it I do *not* go back of the orders made under the acts of the legislature,) the most favorable view of the transaction is that at the time of giving the mortgage, Mapes and Oakley verbally agreed to advance in cash whatever balance there might be of the $1000, after deducting their old note and book debts; and that seven months afterwards, they gave their note for such balance. I cannot presume that the verbal agreement was for any definite sum in cash, because the balance was only obtained subsequently by deducting the

account which accrued after the date of the mortgage.    The note was paid by Mapes and Oakley, and it may be assumed that they were sufficiently responsible to make good their promise.

The order of May 30th, 1816, giving its terms the full import claimed for them, authorizes Clarke to mortgage the property therein referred to, for securing *the sum or sums of money to be advanced or lent to him or for his use,* by *the mortgagee or mortgagees.*

A promise to advance money at a future period, is not money lent or advanced.    And as this was a power of a very extraordinary character, if not in derogation of common right, no court can extend it by construction.    (See *Bloom* v. *Burdick*, 1 Hill, 140; 6 ibid. 415, *Rogers* v. *Dill.*)

The mortgage was therefore beyond the authority conferred, in respect of this note.    The subsequent giving of the note and its payment at maturity, did not make good by relation, what was invalid in its inception and execution.

Upon the whole, the mortgage is to be deemed valid for $683 50, at the time it was executed.

The defendants have succeeded to the rights of Mr. Kennedy under the mortgage which Clarke executed to him.    This mortgage is also alleged to be invalid.    The testimony in regard to it is not full or satisfactory, and as it is not indispensably necessary to decide upon it in this stage of the cause, it will be more conducive to a just conclusion, to leave its entire or partial validity for determination on the reference which will follow a decree for redemption on the other mortgage.    The parties can thus produce further testimony on the subject.

IV.  The defendants in the last place, contend that Mrs. Williamson and Mrs. Cochran are barred by the limitation of ten years prescribed in the revised statutes for the commencement of suits in equity.

Mr. Field obtain possession of the premises in March or April, 1827, which was after the death of the tenant for life.

At that time all the children were under age, but Mrs. Williamson's minority terminated in 1828, and Mrs. Cochran's in 1830.  The disability arising from marriage was, in the case of

each, subsequent to the accruing of their perfect right to redeem, and cannot be tacked to that founded upon their infancy.

As the law was in April, 1827, each of these parties had twenty years in which they were entitled to redeem. (*Moore* v. *Cable*, 3 J. C. R. 385; *Burke* v. *Lynch*, 2 Ball & B. 426.) So that when the revised statutes went into effect, each was entitled to ،about seventeen years for that purpose.

It is claimed that the revised statutes cut off seven years of this period, and if they did, these two complainants were barred before the commencement of their suit.

I do not find that it has ever been decided, that the fifty-second section of the sixth article of the title of the revised statutes relative to the time of commencing actions, (which introduced a law entirely new,) is applicable to cases where the right of action existed before they took effect.

It has been decided in some cases, that statutes of limitation affect *the remedy* and not *the right*. But the grounds of this conclusion do not appear sufficiently forcible to me, to warrant a court in construing such a statute in a manner which will in effect defeat a vested right by an abrupt termination of every remedy for it, unless the language of the statute itself imperatively requires that construction. If the section in question is to be applied to all prior equitable rights, a party who on the last day of December, 1829, had ten years in which to bring his suit, might on the next day find himself barred by lapse of time. Or if in December, 1829, he had only nine years left in which to redeem his estate from a mortgage, he would on the first day of the new year, be barred of his right, and his estate be gone.

I know it is said, that the construction of the statute must be such as to give the full ten years from January 1, 1830, or at all events to give that period in all cases where there remained ten years under the old law. This is argued upon the impossibility of attributing to the legislature, such an outrage upon all right, as to cut off a remedy suddenly and absolutely, by an act of limitation.

But the statute itself says nothing of ten years, or of any other term, from the *time it goes into effect.* Its language is plain and positive, " within ten years *after the cause thereof shall accrue,*

*and not after."* It is equally plain that the right in this case had accrued in 1827, and by the clear terms of the law, if applicable to it, was barred in 1837.

In order to construe the statute in the mode suggested, we must add to the section "or within ten years after this article takes effect." No construction, it seems to me, can put that idea into the section as it now stands. And it is certainly as reasonable and, just, to presume that the legislature did not intend to affect, impair or diminish, existing rights at all; as it is to engraft an addition upon the section in the statute in order to save it from absurdity; or force it by the construction which I have just mentioned. But I think the language of the article itself precludes both the addition and the construction which is thus claimed. The limit is not as in section eighteenth relative to actions at law, "after the cause of such action *accrued."* It is "within ten years after the cause thereof *shall accrue."* The statute speaks from the time it took effect, and it thus applied to cases which *should accrue* after that time, and not to those which had already accrued.

I submit also that upon sound rules of construction as well as of justice and morality, it may be shown that this section of the article did not apply to existing rights of action.

It does not in express terms, affect such rights. On the contrary, its terms look to the future. In connection with the 49th section respecting concurrent jurisdiction in law and equity, and the 45th section which was inserted for greater caution and expressly excludes the provisions of the first four articles from affecting rights of action which had then accrued; the 52d section admits of a construction which refers it to future rights alone. (2 R. S. 300, 301.)

The revisers note to section 45th shows that they did not design to give to any part of that title, a retroactive effect. (3 R. S. 704, 2d ed.)

The general rule is that no statute is to have a retrospect beyond the time of its commencement; *nova constitutio futuris formam debet imponere, non prœteritis.* (Bac. Abridg. Statute, C.; Dwarris on Stat. 680; 1 Kent's Comm. 455, 2d ed.) And in his masterly judgment in *Dash* v. *Van Kleeck,* (7 Johns.

R. 477, 500,) the learned commentator shows that this is a principle of universal jurisprudence.

In the case just cited, the defendant relied upon an act passed, pending the suit, which declared the construction of a previous statute, and if applied to previous cases, in effect, exonerated parties from the consequences of a different construction which it had received in the Supreme Court.    It was decided by that court, that the act relied upon, did not operate retrospectively, or affect the suit.    Although Judge Spencer delivered a strong dissenting opinion, I believe the arguments of Chief Justice Kent and Judge Thompson on the other hand, have always commanded the assent of the bar, and of jurists, wherever the report of the case has been read.(a)

In *Sayre* v. *Wisner*, (8 Wend. 661,) the point was presented in a case arising under the revised statutes as to dower.    By 1 Rev. Stat. 742, § 18, it is enacted that a widow shall demand her dower within twenty years after the death of her husband.    The husband in that case had been dead more than twenty years before the revised statutes.    The provision was new, and abridged the previous term allowed for the widow's entry, and if it were applied to the case, it cut off the plaintiff's remedy.    The Supreme Court held it to be a statute of limitation, but that it did not operate retroactively, and did not therefore affect the claim.    Chief Justice Savage said, no statute, as a general rule is to have a retrospect beyond the term of its commencement.    And, " a statute never ought to have such a construction as to divest a right previously acquired, if it be susceptible of any other; giving it a reasonable object and full operation within such construction."

The saving clause referred to in that case, (1 R. S. 750, § 11,) speaks of vested *estates, interests* or *rights.*    It of course had no

---

(a) In *Quackenbush* v. *Danks,* (1 Denio, 128,) the same doctrine was applied by the Supreme Court to a statute exempting property from execution and distress for rent.    (And see the argument of Bronson, Justice, in *Sackett* v. *Andross,* 5 Hill, 334, &c.    Also, *Doe, d. Evans,* v. *Page,* 5 Queen's Bench R. 767, and 8 Lond. Jur. Rep. 399 ; *Doe d. Jukes* v. *Sumner,* 14 Mees. & Welsby, 39, and 9 Lond. Jur. Rep. 413 ; *Doe* v. *Angell,* 10 ibid. 705, in the Queen's Bench, Feb. 12, 1846.)

bearing, if as is contended, a statute of limitation affects the *remedy* only.

In *The People* v. *The Supervisors of Columbia County*, (10 Wend. 362,) which arose under the general statute of limitations in the revised statutes, Chief Justice Savage says, "those statutes, like all others, are prospective, and so are to be construed, unless otherwise expressed; or unless they cannot have the intended operation, by any other than a retrospective construction."

The same doctrine precisely, though in reference to another part of the statutes, is laid down by the Supreme Court in *Hackley* v. *Sprague*, (10 Wend. 113.)

And in *Johnson* v. *Burrell*, (2 Hill, 238,) Judge Cowen of the same court, when speaking of the construction of a statute, says, " It is a general rule that a statute affecting rights and liabilities should not be so construed as to act upon those already existing. To give it that effect, the statute should in terms declare an intention so to act."

In *Cruger* v. *Hamilton*, (January, 1841,) my learned predecessor declared his opinion that the 52d section of the statute of limitations, did not apply to causes of action which had accrued before it went into operation.

With these lights for my guidance, and with a deep sense of the sound propriety of the principle which governed them, I am confident that I shall best promote the true intent of the provision of the revised statutes under consideration, by construing it to have no application to the complainants rights which were vested and perfect before those statutes took effect.

The complainants insisted that if any of the provisions of the sixth article were applicable to the case, they were still in time under the 49th section, because they had a remedy at law by ejectment, and the jurisdiction being thus concurrent, they are not barred short of the 20 years allowed for bringing ejectment.

This ground was taken on the assumption that the mortgage was wholly void; yet that the complainants might waive that position.

The mortgage being valid in part, it is an interesting inquiry, whether the complainants could bring ejectment; and if so, whether the remedy for redemption in equity is a *concurrent*

*jurisdiction* within the 49th section.    The former depends upon the legality of Mr. Field's possession as against the remainder-men who were not affected by the decree under which he purchased ; the possession having been rightfully acquired in respect of the tenant for life.    (See *Van Duyne* v. *Thayer*, 14 Wend. 233 ; and 19 ibid. 162 ; *Phyfe* v. *Riley*, 15 ibid. 248 ; *Watson* v. *Spence*, 20 ibid. 260 ; 4 Kent's Comm. 188, 2d ed.)

In the view I have taken of the effect of the limitation prescribed in the 52d section of the same article of the revised statutes, it is unnecessary for me to pursue this inquiry.

There must be the usual decree for a redemption and for taking the accounts before a master.